UNITED STATES of America
v.
Lawrence PARISH, Appellant.
No. 23345.

United States Court of Appeals,
District of Columbia Circuit.

Argued June 18, 1971.

Decided Sept. 25, 1972.

Mrs. Jean F. Dwyer, Washington, D. C. (appointed by this court), for appellant.

Mr. Daniel J. Bernstein, Asst. U. S. Atty., with whom Messrs. Thomas A. Flannery, U. S. Atty. at the time the brief was filed, John A. Terry and Theodore Wiesemen, Asst. U. S. Attys., were on the brief, for appellee. Mr. John Ellsworth Stein, Asst. U. S. Atty., also entered an appearance for appellee.

Before McGOWAN, TAMM and ROBINSON, Circuit Judges.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

Appellant was convicted by a jury on counts of armed robbery,[1] assault with a dangerous weapon[2] and carrying a pistol without a license,[3] and was sentenced to concurrent terms of imprisonment.[4] He seeks reversal on two principal

---

1. D.C.Code §§ 22–2901, 22–3202 (Supp. V 1972).

2. D.C.Code § 22–502 (1967).

3. D.C.Code § 22–3204 (1967).

4. Appellant is serving concurrent sentences of fifteen years to life for armed robbery, forty months to ten years for assault with a dangerous weapon, and one year for carrying a pistol without a license. The indictment against appellant also contained a count of unarmed robbery, D.C. Code § 22–2901 (Supp. V 1972), which the jury, pursuant to the trial court instructions, disregarded upon convicting him of armed robbery, and which the court, on the Government's motion, ultimately dismissed.

grounds. The first is that the constitutional guaranties of due process of law and speedy trial were infringed by the passage of seventeen months from the date of the offenses to the commencement of his trial. The second is that events implicating him in the crimes were so tainted that suppression of evidence identifying him as a participant was required. We hold, conversely to these claims, that the delay complained of did not contravene the Due Process Clause of the Fifth Amendment or the Speedy Trial Clause of the Sixth,[5] and that the forerunners of appellant's identification were free from legal impropriety.[6] We accordingly affirm the conviction.

## I

The offenses which are the basis of appellant's conviction occurred about 6:40 on the evening of December 12, 1967. W. Cardell Shelton, manager of an apartment complex, was closing its rental office; with him was Wiley Barnes, a plumber, with whom Shelton was discussing recently completed repairs. Two men—face-masked by stockings and one armed with a pistol—burst through the door, firing once. The armed intruder pointed the pistol into Barnes' face, announced that "[t]his is a holdup," and demanded money; receiving no response, he motioned Barnes and Shelton to the back of the office, shoving Barnes in that direction. Evading the demand, Shelton turned and was moving to the rear when the gunman fired the pistol once, grazing Shelton in the stomach, and then fired again, this time into the wall. Shelton capitulated,

and opened his jacket to reveal an envelope containing $800 in rental receipts. The armed man took the envelope from Shelton and struck him across the head with the butt of the pistol. As the robbers exited, the armed bandit fired another shot, creasing Shelton's arm.

After the robbery, Shelton examined police photographs several times and identified both robbers sometime—approximately a week—prior to January 14, 1968. That date is important to the historical posture of the case because it was about then that a fire gutted an apartment under Shelton's management[7] which had been leased to appellant's wife.[8] On the following day, Shelton, in his capacity as property manager, entered the apartment to determine the extent of the damage. There he came across a large photograph and a smaller snapshot of a man—appellant, it developed—whom he recognized as his armed assailant of December 12. Shelton removed both pictures from the apartment and turned the larger over to the police, but retained the smaller snapshot in the hope that, by displaying it to friends, he might be able to find the party photographed. Barnes also identified appellant from police photographs as one of the two robbers.[9]

A warrant for appellant's arrest was issued on January 22, 1968,[10] and on August 12, he was indicted, but he was not arrested until October 13. When, on May 14, 1969, the case reached trial, the court heard and denied a motion to dismiss the prosecution for prejudicial delay and another motion to suppress the identification evidence linking appellant to the crimes. During trial before the

---

5. Parts II and III, *infra*.

6. Part IV, *infra*.

7. Shelton could not remember the exact date the fire occurred. He did recall entering the apartment on the day of the fire for a general view of the damage, and returning the following day for a more careful assessment.

8. Since the parties refer to her as appellant's common law wife, so do we. The

record indicates, however, that appellant contracted a previous marriage which had not been dissolved. If that is so, the reference is inapt. See Friedenwald v. Friedenwald, 57 App.D.C. 13, 14, 16 F. 2d 509, 510, cert. denied, 273 U.S. 763, 47 S.Ct. 476, 71 L.Ed. 879 (1927).

9. See note 60, *infra*, and accompanying text.

10. The warrant was predicated on a photographic identification by Shelton.

jury, Shelton and Barnes unequivocally identified appellant from the witness stand,[11] and Sergeant George R. Wesley testified to their pretrial photographic identifications. Shelton also related his discovery of the photograph and snapshot in the apartment, and those items were introduced into evidence. Appellant denied participation in the robbery and endeavored to show that he was attending a vocational class when it occurred.[12] The jury was persuaded by the Government's case and convicted.

## II

In support of his contention that prosecution of the charges against him was unconstitutionally delayed, appellant invokes the Fifth and Sixth Amendments, and the Government recognizes that both have some applicability to the case, but appellant does not draw precisely, nor the Government accurately, the line of demarcation between the two provisions. We deem it helpful to ascertain, at the outset of discussion, the reach of each in appellant's situation.

■ The Sixth Amendment incorporates the guaranty that "in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." The phase of the criminal process to which that right extends has only recently been defined by the Supreme Court. In United States v. Marion,[13] the Court held that the Speedy Trial Clause has "no application until the putative defendant in some way becomes an 'accused,' " [14] and that its protection "is activated only when a criminal prosecution has begun and extends only to those persons who have been 'accused' in the course of that prosecution." [15] More specifically, the Court continued, "it is either a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge that engage the particular protections of the speedy trial provision of the Sixth Amendment." [16] Those protections exist, the Court said, "to prevent undue and oppressive incarceration prior to trial, to minimize anxiety and concern accompanying public accusation and to limit the possibilities that long delay will impair the ability of an accused to defend himself." [17]

11. Notwithstanding the stocking masks worn by the two robbers, the identifications by both witnesses were emphatic. Shelton testified that he "was close enough to Mr. Parish to kiss him," and that he "could see quite a bit through the mask. . . . " He added that he "was able to see his eyes, his expression . . . looking at a gun and a man pointing and shooting at you, its nothing for you to do but just stare at him and watch him," and that "Mr. Parish has got rather unusual eyes." Barnes similarly had "no doubt" that appellant was the man who held the gun.

12. Although appellant, owing to the lapse of time, was unable to recollect independently whether he had in fact attended class on the evening of the offense, it was stipulated at trial that attendance records showed that he did. This aspect of the case is discussed more fully in Part III, *infra*.

13. 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971).

14. *Id.* at 313, 92 S.Ct. at 459.

15. *Id.*

16. *Id.* at 320, 92 S.Ct. at 463. We note also Fed.R.Crim.P. 48(b), which provides:

   If there is unnecessary delay in presenting the charge to a grand jury or in filing an information against a defendant who has been held to answer to the district court, or if there is unnecessary delay in bringing a defendant to trial, the court may dismiss the indictment, information or complaint.

   This provision, however, "clearly is limited to post-arrest situations." United States v. Marion, *supra* note 13, 404 U.S. at 319, 92 S.Ct. at 463. See also Nickens v. United States, 116 U.S.App. D.C. 338, 339, 323 F.2d 808, 809 (1963).

17. United States v. Ewell, 383 U.S. 116, 120, 86 S.Ct. 773, 776, 15 L.Ed.2d 627 (1966). And in United States v. Marion, *supra* note 13, 404 U.S. at 320, 92 S.Ct. at 463, the Court added:

   Inordinate delay between arrest, indictment, and trial may impair a defendant's ability to present an effective defense. But the major evils protected

■ The Fifth Amendment, on the other hand, insures among other things that "no person shall be . . . deprived of life, liberty, or property, without due process of law." Essential fairness is a fundamental due process requirement in criminal prosecutions,[18] and untoward delay in notifying the accused of the charges to be pressed breeds unfairness by adversely affecting the preparation and presentation of his defense.[19] Statutes barring prosecutions after lapse of designated time periods interpose "the primary guarantee against bringing overly stale criminal charges,"[20] but "the statute of limitations does not fully define the [accused's] rights with respect to the events occurring prior to indictment."[21] On the contrary, "the Due Process Clause of the Fifth Amendment . . . require[s] dismissal of the indictment if it [is] shown at trial that the preindict-

ment delay in [the] case caused substantial prejudice to [the accused's] rights to a fair trial and that the delay was a purposeful device to gain tactical advantage over the accused."[22] While the Speedy Trial Clause addresses damage to the defense and other apprehensions as well,[23] the concern of the Due Process Clause is erosion of the accused's capability to muster his response to the charges.[24]

■ We may now, against this backdrop, sort out the periods to which the speedy trial and due process protections respectively obtained in this case. It will be recalled that the offenses took place on December 12, 1967; that a warrant for appellant's arrest was issued on January 22, 1968; that appellant was indicted on the following August 12 and arrested two months later on October 13; and that the case reached trial on May 15, 1969. It thus becomes ap-

against by the speedy trial guarantee exist quite apart from actual or possible prejudice to an accused's defense. To legally arrest and detain, the Government must assert probable cause to believe the arrestee has committed a crime. Arrest is a public act that may seriously interfere with the defendant's liberty, whether he is free on bail or not, and that may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends.

18. See. Lisenba v. California, 314 U.S. 219, 236, 62 S.Ct. 280, 86 L.Ed. 166 (1941); United States ex rel. Innes v. Hiatts, 141 F.2d 664, 666, 667 (3d Cir. 1944). *Cf.* Chavez v. Dickson, 280 F. 2d 727, 735 (9 Cir.), cert. denied, 364 U.S. 934, 81 S.Ct. 379, 5 L.Ed.2d 366 (1960); State v. Caffey, Mo., 438 S.W. 2d 167, 172, cert. denied, 396 U.S. 853, 90 S.Ct. 114, 24 L.Ed.2d 102 (1969); State v. Haas, 69 S.D. 204, 8 N.W.2d 569, 570 (1943).

19. This consideration underlies our own rule, fashioned in the exercise of our supervisory jurisdiction, regarding prearrest delay in prosecuting alleged violations of the federal narcotics laws. *E. g.,* Ross v. United States, 121 U.S.App.D.C. 233, 234, 349 F.2d 210, 211 (1965); Woody v. United States, 125 U.S.App.

D.C. 192, 370 F.2d 214 (1966). This rule is addressed to the peculiar circumstances usually associated with narcotics cases, *e. g.,* Robinson v. United States, 148 U.S.App.D.C. 58, 64, 459 F.2d 847, 853 (1972), and is limited to such cases. Tynan v. United States, 126 U.S.App. D.C. 206, 208, 376 F.2d 761, 763 (1967). See Godfrey v. United States, 123 U.S. App.D.C. 219, 358 F.2d 850 (1966); Powell v. United States, 122 U.S.App. D.C. 229, 352 F.2d 705 (1966); Nickens v. United States, 116 U.S.App.D.C. 338, 323 F.2d 808 (1963), cert. denied, 379 U.S. 905, 85 S.Ct. 198, 13 L.Ed.2d 178 (1964).

20. United States v. Ewell, *supra* note 17, 383 U.S. at 122, 86 S.Ct. at 777. See also United States v. Marion, *supra* note 13, 404 U.S. at 322–323, 92 S.Ct. 455; Toussie v. United States, 397 U.S. 112, 114–115, 90 S.Ct. 858, 25 L.Ed.2d 156 (1970).

21. United States v. Marion, *supra* note 13, 404 U.S. at 324, 92 S.Ct. at 465.

22. *Id.*

23. See note 17, *supra,* and accompanying text.

24. Compare United States v. Marion, *supra* note 13, 404 U.S. at 321, 92 S.Ct. 455; United States v. Ewell, *supra* note 17, 383 U.S. at 120, 86 S.Ct. 773.

parent that the speedy trial safeguard of the Sixth Amendment attached on August 12, 1968, the date of the indictment,[25] and extended through the ensuing nine-month period to the commencement of trial. It is also clear that the due process bulwark of the Fifth Amendment surrounded the ten-month period from the offense date to the date of appellant's arrest, at which point he first learned that he was being charged.[26] The task at hand, then, is separate examination of these two periods in light of their separate criteria in order to determine whether appellant's claim of unconstitutional delay is well founded.

### III

Asserting that the prearrest delay in his case was avoidable, appellant argues that his belated apprehension and notification of the charges were results of police inefficiency, and that evidence which would have strengthened his defense was destroyed in the meantime.

25. See text *supra* at notes 13–16. See also United States v. Marion, *supra* note 13, 404 U.S. at 321–322 n. 13, 92 S.Ct. 455; Advisory Committee on the Criminal Trial, American Bar Association, Standards Relating to Speedy Trial, commentary on § 2.2(a) at 18–19 (1967).

26. It will be noted that for approximately two months of the total seventeen-month period from offenses to trial, the protections of the Due Process and Speedy Trial Clauses overlap. That two-month period is from August 12, 1968, the date of the indictment, to October 13, 1968, the date of appellant's arrest. The due process guaranty spans the full period from offenses date to date of the accused's notification of the charges. See text *supra* at notes 18–24. The speedy trial guaranty attaches upon indictment or arrest and holding to answer, whichever occurs first. See text *supra* at notes 13–16. During the two months in question, appellant thus enjoyed the benefits of both constitutional provisions.

27. See Jackson v. United States, 122 U.S. App.D.C. 324, 326–327, 353 F.2d 862, 864–865 (1965), and cases there cited.

28. We assume, without deciding, that appellant's due process claim properly embraces an inquiry into those allegations. We note, however, that in United States

The trial judge conducted an evidentiary hearing on these protests and ruled against appellant on both. Although at one point during the course of the hearing the judge remarked that "proper diligence [had not been] used to execute the arrest warrant," the judge later found, on fuller evidence, that "considering [their] availability and the amount of crime in this country, the police probably did about as well as they could be expected, although certainly given time and personnel they could have done more." The judge also found that appellant had suffered no prejudice in the advancement of his defense in consequence of the delay. Since these findings must stand unless clearly erroneous,[27] we look now to see whether they were adequately sustained by the evidence.

In support of the allegations of police inefficiency,[28] appellant testified that he was continuously available for arrest throughout the ten-month prearrest pe-

v. Marion, *supra* note 13, 404 U.S. at 321–322 n. 13, 92 S.Ct. at 464, the procedural log-jamming consequent upon investigations of claims of that sort was given as a reason for not extending the Speedy Trial Clause to the period before indictment or arrest:

Extending a Sixth Amendment right to a period prior to indictment or holding to answer would also create procedural problems: "[W]hile other rights may be violated by delay in arrest or charge, it does not follow that the time for trial should be counted from any date of inaction preceding filing of the charge or holding the defendant to answer. To recognize a general speedy trial right commencing as of the time arrest or charging was possible would have unfortunate consequences for the operation of the criminal justice system. Allowing inquiry into when the police could have arrested or when the prosecutor could have charged would raise difficult problems of proof. As one court said, 'the Court would be engaged in lengthy hearings in every case to determine whether or not the prosecuting authorities had proceeded diligently or otherwise.' [United States v. Port, Crim. No. 33162, (ND Cal., June 2, 1952). Quoted in Note, Justice Overdue—Speedy Trial for the Poten-

riod; more particularly, that for a while he was on probation for another offense and was reporting monthly to his probation officer, and after the expiration of probation was employed by a local business known to the probation officer.[29]

Had the police been more adroit, appellant asserts, routine investigation of readily available records would have led them directly to him for a much more timely arrest.[30]

In response, Sergeant Wesley testified that the police did expend considerable energy in unsuccessful attempts to locate appellant. They disseminated a local lookout via police teletype and put a "stop" on his criminal record;[31] they inquired of postal authorities for a forwarding address from his wife's apartment;[32] and they checked tax, criminal and traffic records in efforts to ascertain his whereabouts.[33] As late as August, when a recheck of traffic records supplied an address which turned out to be the home of his parents,[34] a visit there and a discussion with the parents failed to provide any lead as to where he was.[35] It was not until early October that Sergeant Wesley, upon a check with an employment office, was able to trace appellant's place of work. When that was done, appellant was promptly arrested on his job.[36]

■ The record is devoid of any indication that the delay in arresting appellant was the product of any deliberate effort by the police to gain an advantage.[37] In our view, the record also furnishes abundant evidentiary support for the trial judge's finding that a reasonable endeavor was made to locate appellant.[38] Beyond that, and perhaps even more powerfully, the record sustains the judge's additional finding that in any event appellant was not harmed by the delay.

Appellant resisted the charges on the ground that on the offense date he attended an evening class at a vocational high school conducted from 7:00 to 10:00 p. m. Since the offense occurred more than 30 blocks from the school,

---

tial Defendant, 5 Stan.L.Rev. 95, 101–102, n. 34.]" Commentary to Rule 2.2(a), Speedy Trial, n. 10, *supra*, at 23.

29. See note 36, *infra*.

30. See note 36, *infra*.

31. The "stop" assured that Sergeant Wesley would be notified in the event that any other law enforcement officer investigating appellant's criminal record possessed information as to his whereabouts.

32. Shelton testified that shortly after the fire appellant's wife removed her belongings from the apartment but that she left no forwarding address. Before leaving, she told Shelton that she did not know where appellant was, and Shelton relayed this information to the police.

33. Appellant's criminal record was rechecked repeatedly, and his traffic record at least twice.

34. Appellant had taken a road test, and had listed his parents' address. Sergeant Wesley testified that the processing of information of this type normally takes time, and that it was not until his second check of the traffic records that he obtained this listing.

35. Sergeant Wesley requested appellant's father to inform appellant, if he saw him, that he was wanted on a robbery warrant. The father agreed to do so, but nothing ever came of the officer's effort.

36. Appellant had been convicted of petit larceny and placed on probation on September 24, 1964, for a period of one year. On March 17, 1965, a bench warrant issued for an alleged violation of probation, but appellant was not apprehended until August 25, 1967, at which time his probation was extended until August 25, 1968. During the period of probation extention, appellant reported to the probation office monthly, and had given that office the address of his parents. It was not the practice of the probation office to notify the Metropolitan Police Department of probation violations.

37. See United States v. Dickerson, 347 F. 2d 783, 784 (2d Cir. 1965); United States v. Simmons, 338 F.2d 804, 806 (2d Cir. 1966). Compare Godfrey v. United States, *supra* note 19, 123 U.S. App.D.C. at 221, 358 F.2d at 852; Ross v. United States, *supra* note 19, 121 U.S. App.D.C. at 235, 349 F.2d at 212.

38. See text *supra* at notes 31–36. *Cf.* United States v. Mills, 149 U.S.App.D.C. 345, 354, 463 F.2d 291, 300 (1972).

took place at 6:40 or 6:45 p. m. and lasted approximately ten minutes, it is evident that the alibi was strong if indeed appellant was in class at 7:00 p. m. when it started. It was stipulated at trial that attendance records showed that appellant was in class that evening, but the exact time he reported in was not the subject of stipulation or proof. Appellant claims that he suffered prejudice from the prearrest delay because of the destruction of a sign-in sheet which assertedly would have assisted him in proving his point.

The sign-in sheet functioned as the original record of class attendance on the date in question.[39] As the name implies, students could sign it at any time while in class that evening.[40] The sign-in sheet was discarded when the attendance information it contained was transferred to the students' permanent records; had that sheet been available at trial, appellant argues, it might have shown his signature at or close to the top, and thus might have kindled an inference that he was present when class began at 7:00 p. m. and therefore could hardly have committed a robbery minutes earlier at a distant location.

This argument did not impress the trial judge on the question of prearrest delay or the jury on the issue of guilt or innocence, and we think harm from destruction of the sign-in sheet is dubious. Even if the sheet could have been produced, no means existed to verify that the order in which the names appeared on the list corresponded with the order in which students actually reported for class.[41] Consequently, it was impossible to correlate the position of any signature with the precise time of the signer's arrival. There was, moreover, a complete absence of any indication as to when the sign-in sheet was discarded.[42] From aught that appeared, it could have been destroyed long before the prearrest delay reached proportions which would raise a question of due process.[43] By the same token, there was nothing to show a nexus between the delay and the unavailability of the sheet.[44]

We conclude that appellant's contention that prearrest delay wrought a deprivation of due process cannot prevail. "To accommodate the sound administration of justice to the rights of the defendant to a fair trial will necessarily involve a delicate judgment based on the circumstances of each case."[45] That judgment, of course, must be sustained on appeal unless demonstrably wrong.[46] In this case, the trial judge heard witnesses on both sides of the issue and

---

39. It was the class instructor's regular practice to post a sign-in sheet which students could sign at any time during class attendance.

40. See note 41, *infra*, and accompanying text.

41. This was primarily because students were not required to sign the sheet when they reported for class, but could do so at any time while the class was in progress. Moreover, a signature appearing at or near the top of the list could have been made by a late-arriving student who chose to put his name in front of others who actually arrived before he did.

42. All that the record reflects is that the instructor kept records for each quarter. It is not known whether he destroyed the sheets on a daily, weekly or other periodic basis.

43. Compare Robinson v. United States, *supra* note 19, 148 U.S.App.D.C. at 58,

459 F.2d at 854; Smith v. United States, 135 U.S.App.D.C. 284, 286, 418 F.2d 1120, 1122 (1969).

44. See cases cited *supra* note 43.
    We think, too, that other claims of prejudice appellant advances meet a similar fate. Complaint is made of the disappearance of his wife, but nothing in the record indicates what her testimony would have been or how it would have supported appellant's defense had she been available. And the complaint that the instructor of the vocational class could not independently recall whether or not appellant had been present on the evening in question fails for want of any indication that he would have been likely to so recall at an earlier date.

45. United States v. Marion, *supra* note 13, 404 U.S. at 325, 92 S.Ct. at 465, 30 L.Ed. 2d 468.

46. See note 27, *supra*, and accompanying text.

concluded that a due process violation had not been shown. Our painstaking review of the record discloses no basis for upsetting that conclusion.

## IV

We turn now to the nine-month period extending from appellant's indictment to his trial in order to ascertain whether his Sixth Amendment right to a speedy trial was impinged. Our determination in this regard is greatly facilitated by the Supreme Court's very recent decision in Barker v. Wingo,[47] which delineates for the first time the criteria by which claims under the Speedy Trial Clause are to be assessed.[48] *Barker* mandates "a balancing test, in which the conduct of both the prosecution and the defendant are weighed,"[49] and identifies four factors of prime importance: "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant."[50] Neither of these factors, the Court admonished, is "either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant."[51] We find that appellant's speedy trial claim does not survive measurement by *Barker* standards.

The length of postindictment delay here was nine months. To be sure, in ordinary cases a delay of that duration is disquieting.[52] During the first two months of the period here, however, appellant was still at large and the police were doing their best to locate him;

the trial judge so found, and we have found ample support for the finding.[53] The focus of our attention thus shifts to the remaining seven months elapsing between appellant's arrest and his trial.

The record before us adds but scantily to the well known overburden in the District Court as the reasons for this part of the delay.[54] Of more importance, in our judgment, is the fact that appellant did not press his speedy trial right until five months after he was arrested.[55] In *Barker*, the Court "emphasize[d] that failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial."[56] Equally significant, we think, is the fact that, as the trial judge found, appellant sustained no prejudice to his defense which could be attributed to delay at the postarrest stage of the prosecution.[57] By our appraisal, the balance of circumstances decidedly favors the Government, and appellant's speedy trial argument must be rejected.

## V

Appellant's last point is that the trial judge erred in permitting Shelton and Barnes to identify him in the courtroom as one of the two robbers, and in allowing the Government to show the pretrial photographic identifications that each made of appellant. The circumstances pertinent to this contention may be briefly recounted. Shortly after the robbery, Shelton was shown numerous police photographs, and from them he identified both of the robbers. About a week later, when he went into appellant's wife's apartment to inspect the

47. 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed. 2d 101 (1972).

48. *Id.* at 530–533, 92 S.Ct. 2182.

49. *Id.* at 530, 92 S.Ct. at 2191.

50. *Id.*, 92 S.Ct. at 2192.

51. *Id.* at 533, 92 S.Ct. at 2193.

52. See United States v. Ransom, 150 U.S. App.D.C. 87, 88, 465 F.2d 672, 673 (1972); Smith v. United States, 135 U.S.App.D.C. 284, 286, 418 F.2d 1120, 1122 (1969). But see, Barker v. Wingo,

*supra* note 47, 407 U.S. at 521, 522, 92 S.Ct. 2182.

53. See text *supra* at notes 31–36.

54. See Barker v. Wingo, *supra* note 47, 407 U.S. at 521, 92 S.Ct. 2182.

55. See *id.* at 528, 92 S.Ct. 2182. See also Hedgepeth v. United States, 124 U.S. App.D.C. 291, 295 n. 4, 364 F.2d 684, 688 n. 4 (1966).

56. Barker v. Wingo, *supra* note 47, 407 U.S. at 532, 92 S.Ct. at 2193.

57. See text *supra* at notes 27, 41–46.

fire damage, he saw the photograph and the snapshot of appellant. He took both, turned the photograph over to the police, and kept the snapshot for some investigating on his own.[58] Sergeant Wesley testified that thereafter Shelton made still another identification of appellant from police albums.[59] Barnes testified that in mid-May he picked out appellant from a group of six black and white pictures.[60]

The thrust of appellant's argument is that Shelton's entry into the apartment and appropriation of the photograph and snapshot amounted to an illegal search and seizure, and that these items and the in-court identifications should accordingly have been suppressed. The Government counters with the argument that the Fourth Amendment, as a restraint only on governmental action,[61] did not invalidate Shelton's undertakings as a private citizen.[62] We need not explore the question whether, in the circumstances here—particularly the use which at trial the Government made of Shelton's discoveries—his exploits are to be equated with those of persons acting under color of federal authority.[63]

■ Shelton entered the fire-gutted apartment of appellant's wife in his capacity as resident manager of the apartment complex to ascertain the extent of the damage to property under his supervision. While in the pursuit of his duties, Shelton happened to come across the photograph and snapshot. The trial judge ruled that Shelton was lawfully in the apartment for that purpose—and nothing in the record refutes the correctness of that ruling.[64] The case thus boils down to the discovery of evidence by one who then was where he had a perfect right to be, a situation in no way implicating the Fourth Amendment.[65] In terms of Fifth and Sixth Amendment considerations relevant to pretrial identifications, we see no meaningful difference between this case and a chance face-to-face encounter be-

---

58. Shelton testified that he may have shown the snapshot to Barnes, but Barnes denied being shown the snapshot prior to trial.

59. Shelton testified to having identified appellant from police photographs, prior to discovery of his snapshot in his wife's apartment, and to not having examined police photographs after January 14, 1968. Officer Wesley, on the other hand, testified that he showed Shelton some photographs from which a positive identification was made on January 20. Since Sergeant Wesley was not the officer in charge of the case, he could neither confirm nor deny whether Shelton had made prior positive identifications. The officer who was in charge of the case did not testify because he was on extended sick leave from the force.

60. The identification took place on May 13, 1969, the day before appellant's trial began. See note 58, *supra.*

61. Compare Burdeau v. McDowell, 256 U.S. 465, 475, 41 S.Ct. 574, 65 L.Ed. 1048 (1921), dealing with Fourth Amendment limitations on the admission of evidence acquired illegally by private parties and Coolidge v. New Hampshire, 403 U.S. 443, 487, 91 S.Ct. 2022, 29 L.Ed.2d 564, announcing that a search or seizure conducted by a private person is illegal for purposes of the Fourth Amendment, in light of all the circumstances of the case, when that person is regarded as having acted as an instrument or agent of the state. See also Note, Seizures by Private Parties: Exclusion in Criminal Cases, 19 Stan.L.Rev. 608 (1967); Note, 79 Harv.L.Rev. 1513, 1519 (1966).

62. Burdeau v. McDowell, *supra* note 61, 256 U.S. at 475, 41 S.Ct. 574. In the view we take of this aspect of the case, it is unnecessary for us to decide whether Burdeau v. McDowell, *supra*, has been impaired by Elkins v. United States, 364 U.S. 206, 221, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960) and Mapp v. Ohio, 367 U.S. 643, 659–660, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

63. *Cf.* Coolidge v. New Hampshire, *supra* note 61, 403 U.S. at 487, 91 S.Ct. 2022; United States v. Goldberg, 330 F.2d 30, 35 (3d Cir.), cert. denied, 377 U.S. 953, 84 S.Ct. 1630, 12 L.Ed.2d 497 (1964); People v. Tarantino, 45 Cal.2d 590, 290 P.2d 505 (1955).

64. In fact, at trial, appellant's counsel noted she was in full agreement with that ruling.

65. See notes 61 and 62, *supra,* and accompanying text.

tween the victim of a crime and the party he identifies as the criminal.[66] In sum, we perceive no encroachment upon appellant's rights in consequence of these events.

The judgment of appellant's conviction is accordingly

Affirmed.

66. See United States v. Neverson, 150 U.S.App.D.C. 133, 140, 463 F.2d 1224, 1231 (1972); Long v. United States, 137 U.S.App.D.C. 311, 315–316, 424 F.2d 799, 803–804 (1969).